**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 08-cv-01467-CMA-CBS

KATRINA ANDREWS,

     Plaintiff,

v.

CENTRAL PARKING SYSTEM, INC., a Tennessee corporation,
RICHARD LOCHER, and
PAMELA OSBORN,

     Defendants.

---

## OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

---

Plaintiff Katrina Andrews ("Plaintiff") brings suit against her former employer, Central Parking System, Inc., and two former supervisors, Richard Locher and Pamela Osborn (collectively "Defendants"), alleging violations of federal employment discrimination statutes, 42 U.S.C. §§ 1981 and 2000e, *et seq.*, and state tort and contract law.

The matter is before the Court on Defendants' motion for summary judgment (Doc. # 30).  Accordingly, the Court must decide whether Plaintiff has mustered enough evidence to allow her to proceed to trial.  After considering the parties' arguments and evidence in the record, the Court grants the motion.

## I.  BACKGROUND

Given the procedural posture, the Court views the following facts in light most favorable to Plaintiff, the nonmovant.[1] *Plotke v. White*, 405 F.3d 1092, 1093-94 (10th Cir. 2005).

### *The Employment Situation*

Defendant Central Parking System, Inc., ("CPS") is a national company that owns, manages, and/or operates parking lots throughout the United States.  CPS provides parking services for The Broadmoor Hotel (the "Broadmoor") in Colorado Springs, Colorado.  Defendant Pamela Osborn was, at all relevant times, a Project Manager for CPS and Plaintiff's supervisor.  Defendant Richard Locher was, at all relevant times, a Senior Project Manager for CPS and Ms. Osborn's supervisor.  Plaintiff is African-American.  Richard Locher and Pamela Osborn are Caucasian. (Doc. # 45 at 5.)

CPS hired Plaintiff as a cashier at the Broadmoor on September 22, 2005, at a rate of $9.50 per hour.  Plaintiff began work on September 26, 2005, and was later promoted to part-time weekend and night supervisor.  (Doc. # 45 at 5; Doc. # 30-1 at 2, ¶¶ 3, 4; Doc. # 36-1 at 1, ¶¶ 3, 4.)  The parties dispute when this occurred, but because

---

[1] But only those facts that are identified by evidence that would be admissible at trial, regardless of how viewed, will be considered by the Court in deciding this motion. See *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) ("To determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury.).  As to disputed facts, only those that are material, *i.e.*, outcome-determinative, will preclude the entry of summary judgment.  *See Schwartz v. Brotherhood of Maintenance of Way Employees*, 264 F.3d 1181, 1183 (10th Cir. 2001).

the dispute is immaterial the Court disregards it.  The parties agree that approximately

three months after she was hired, Plaintiff received a pay raise from $9.50 an hour to

$10.00 an hour.  (Doc. # 30-1 at 2, ¶ 4; Doc. # 36-1 at 1, ¶ 4; Doc. # 30-2 at 108:17-22.)

During her employment, Plaintiff acknowledged receipt of the Location Rules for

CPS which prohibit using profane or abusive language toward a customer, employee

or manager, and threatening, striking, or fighting with anyone on company property.

(Doc. # 30-1 at 3, ¶ 5; Doc. # 36-1 at 1, ¶ 5; Doc. # 30-7 at 6-11, ¶¶ 24, 32.)  CPS policy

prohibits discrimination, harassment, and retaliation and requires that CPS managers

"certify that they are not aware of any violations [of the rules] at their locations."

(Doc. # 37-6 at 8, 13, 18.)  CPS policy further requires that all employees aware

of harassment report it immediately.  (*Id.* at 13.)

On or about September 26, 2005, Christian Foster, a Caucasian male, was hired

as a CPS cashier at the Broadmoor, at a rate of $9.50 an hour.  (Doc. # 30-10, ¶ 5.)

Mr. Foster was promoted to part-time supervisor, around the same time as Plaintiff

received her promotion.  (Doc. # 30-1 at 3, ¶ 6; Doc. # 36-1 at 1, ¶ 6.)  Although they

both earned the same hourly wage, Plaintiff states in her affidavit that Mr. Foster was

permitted to receive tips while Plaintiff was not.  (Doc. # 36-14 at 7.)  That statement

is contradicted by Ms. Osborn, who testified that both Mr. Foster and Plaintiff were

permitted to receive tips.  (Doc. # 37-2 at 28:17-29:4.)  As detailed in the analysis

section below, because Plaintiff's "facts" regarding who was allowed tips are not based

on her personal knowledge, the Court disregards them.

The innocuous maintenance employee at the center of Plaintiff's wage claim is a man named David Meeker.  CPS hired Mr. Meeker in September of 2005 at a rate of $10.00 per hour.  As a maintenance employee, Mr. Meeker had a different position than that of Plaintiff with entirely different job responsibilities than those of Plaintiff.  (Doc. # 30-10, ¶ 6.)  As part of her duties, Plaintiff supervised the maintenance employees. (Doc. # 30-1 at 3, ¶ 7; Doc. # 36-1 at 1, ¶ 7; Doc. # 36-14 at 6.)

Plaintiff and Mr. Meeker both received raises in January of 2007, increasing their respective wages from $10.00 an hour to $10.30 an hour.  (Doc. # 30-1 at 4, ¶ 9; Doc. # 36-1 at 2, ¶ 9.)  A few months later, on April 23, 2007, Mr. Meeker received another raise, from $10.30 an hour to $11.00 an hour.  Plaintiff did not receive a similar raise. (Doc. # 30-1 at 4, ¶ 10; Doc. # 36-1 at 2, ¶ 10.)  Although Plaintiff asserts that "the reasons for the raise are disputed[,]" she offers no evidence to support this statement. (Doc. # 36-1 at 2, ¶ 10.)  Ms. Kim Dang, a CPS Human Resources representative, testified that she understood Mr. Meeker's raise to be based on the Broadmoor being very happy with Mr. Meeker's performance.  (Doc. # 30-7 at 94:7-14.)

Aside from Plaintiff and Mr. Foster, the only other part-time supervisor of whom the Court is aware is Mr. Ortiz.  CPS hired Mr. Ortiz at a rate of $10.30 per hour in May of 2007, which at the time was the same rate Plaintiff was earning.[2]  (Doc. # 30-1 at 3, ¶ 8; Doc. # 36-1 at 2, ¶ 8; Doc # 30-10, ¶ 7.)

---

[2] The facts regarding Mr. Ortiz are relevant because of Plaintiff's claim that "similarly-situated" employees, *i.e.*, part-time supervisors, were earning more than her.

For reasons not entirely clear, Mr. Foster was fired in July of 2006.  In her affidavit, Plaintiff relays a sordid tale of Mr. Foster involving sex, drugs, and expired tags.  (*See* Doc. # 36-14 at 1.)  There are many evidentiary problems with Plaintiff's story, but the Court, viewing the evidence in favor of Plaintiff, will credit her story to some extent, as explained below.

For purposes of its analysis herein, the Court will assume that certain averments in Plaintiff's affidavit are either within her personal knowledge or could be easily shown to be.  Plaintiff complained to Mr. Locher about Mr. Foster.  In response, Mr. Locher held a meeting, in which Plaintiff participated.  She raised various allegations against Mr. Foster—-sexual harassment, use of drugs, borrowing of money from co-workers, expired tags, license and insurance.[3]  Mr. Locher "warned" Mr. Foster about the "sexual harassment".  Mr. Locher told Plaintiff that there was no proof Mr. Foster was taking drugs.  Mr. Locher then told Mr. Foster he had one week to get a license.  Plaintiff then claims that Mr. Locher never followed up and that "CPS allowed Foster, as a White supervisor, to be above the rules."  Her next averment, however, is that Mr. Foster was fired, which undercuts her claim.  (*See* Doc. # 36-14 at 2.)

### The "Racial" Incidents, Comments, and Wage Disparity

Plaintiff identified various incidents she perceived as evidence of Defendants' racial animus.  First, Plaintiff contends that she did not have the voice mail and computer codes and "White Supervisors" did.  Consequently, she could not go the office and check the voice mail or use the computer.  Despite Plaintiff's requests, Mr. Locher

---

[3]  The tags, license, and insurance are relevant because Mr. Foster and Plaintiff at times acted as parking valets.

never provided Plaintiff the code for the phone.  (Doc. # 36-14 at 3, 4.)  Ms. Osborn

informed Plaintiff that she did not need the codes because she worked the night shift.

This made Plaintiff feel that she "wasn't being trusted or treated fairly in that way."

(Doc. # 30-2 at 135:4-15.)

There was also the Penrose incident, over which Plaintiff felt "humiliated."

Plaintiff contends that all "the employees" except for her received a gift certificate to

eat at the Penrose Room, a restaurant at the Broadmoor.  (Doc. # 30-2 at 135:16-20.)

In response to Plaintiff asking why she hadn't received a gift certificate, Mr. Locher

explained that "it was passed down from higher up." (*Id.*)  Plaintiff elaborates in her

affidavit, explaining that Ms. Osborn and Mr. Locher "gave all the white workers a

certificate to eat in the Penrose Room at the Broadmoor; I did not receive such a

certificate."  (Doc. # 36-14 at 4.)

In addition to these incidents, Plaintiff alleges that she was subjected to racial

comments.  In particular, Plaintiff described various "racial" comments made to her by

Ms. Osborn.  During the summer of 2006, for instance, in the context of discussing

Plaintiff's appearance, Ms. Osborn told Plaintiff the reason black women look so young

is because they get surgery.  (Doc. # 30-2 at 28:22-29:10.)  The exact words, as

recalled by Plaintiff in her affidavit, were: "Black women look so young because you

have surgery."  (Doc. # 36-14 at 3.)  Plaintiff reported this incident to Mr. Locher, adding

that she thought Ms. Osborn was racist.  (Doc. # 30-2 *d.* at 29:13-30:8.)  Mr. Locher

laughed in response.  (Doc. # 36-14 at 3.)  Mr. Locher disputes that Plaintiff ever

complained to him "that she was being harassed by Pam Osborn because of her race

or any other status protected by law."  (Doc. # 37-8, ¶ 4.)  Ms. Osborn also repeatedly

asked Plaintiff how Plaintiff could afford to buy expensive tires or drive a nice car

(a Mustang) and go on vacation–always inquiring about Plaintiff's income.  (Doc. # 30-2

at 30:9-31:4.)  In her affidavit, Plaintiff quotes Ms. Osborn as asking: "What do you do

for money since you have a nice car and take vacations?"  (Doc. # 36-14 at 3.)  On

another occasion, Plaintiff asked Ms. Osborn, "Why you guys don't hire any blacks?"

Ms. Osborn replied, "You guys come in, but you're just not qualified."  (*Id.* at 136:6-12.)

In Plaintiff's affidavit, Ms. Osborn's quote is reproduced as:  "They come in, but most of

you guys are not qualified."[4]  (Doc. # 36-14 at 3.)  Plaintiff characterizes Ms. Osborn as

a "serial harasser."  Ms. Osborn denies making any of these remarks.  (Doc. # 37-2 at

26:12-27:4).

Plaintiff also includes a racial remark made by Mr. Locher, which she never

heard but was told about by a co-worker named Bogdan Toader.  Mr. Locher allegedly

told Mr. Toader that "[w]e do not hire black people because they are too hard to get

rid of."  (Doc. # 36-14 at 3; Doc. # 30-2 at 129:1-130:1.)  These comments, from

Mr. Locher to Mr. Toader to Plaintiff, constitute hearsay; thus, the Court will not consider

them unless each satisfy a hearsay exception.

While Mr. Locher's alleged comment to Mr. Toader may be admissible as non-

hearsay under Fed. R. Evid. 801(d)(2), Mr. Toader's statement reporting Mr. Locher's

remark to Plaintiff is inadmissible hearsay.  Even if Mr. Toader were to testify at trial,

he would still be precluded from testifying about his remark to Plaintiff.  *See Argo v.*

*Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)

---

[4]  Ms. Osborn's alleged remark to Plaintiff is not hearsay under Fed. R. Evid. 801(d)(2).
Thus, Plaintiff could testify about it at trial.

("[A]t summary judgment courts should disregard inadmissible hearsay statements *contained* in affidavits, as those statements could not be presented at trial in any form.")(emphasis in original).  However, Mr. Toader is on Plaintiff's witness list and, if the case went to trial, Mr. Toader could testify about Mr. Locher's remark to him; this would remedy the hearsay problem.  *See id.* ("Parties may . . . submit affidavits in support of summary judgment, despite the fact that affidavits are often inadmissible at trial as hearsay, on the theory that the evidence may ultimately be presented at trial in an admissible form.")

Hearsay problems aside, the Court must still consider whether Mr. Locher's alleged comment is relevant to Plaintiff's claims.  With respect to her hostile work environment claims, the Tenth Circuit has observed that "[w]e have never held, nor would we, that to be subjected to a hostile work environment the discriminatory conduct must be both directed at the victim and intended to be received by the victim."  *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 798 (10th Cir. 2007).  However, to be "discriminatory" in the hostile work environment context, the alleged harassment must be *because* of the plaintiff's protected class.  *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1186 (10th Cir. 2007) ("The harassment must be because of . . . the plaintiff's sex.")(citation, quotation marks, and brackets omitted).  Here, because Mr. Locher's alleged remark references the at-issue race, African-Americans, the Court considers it relevant to Plaintiff's hostile work environment claims.  Thus, in deciding this motion, the Court will consider Mr. Locher's alleged remark that the reason he did not hire black people was because it was too hard to get rid of them.

Plaintiff also discussed in her affidavit another racial comment allegedly made to Mr. Toader by Plaintiff's supervisor, Ms. Osborn.  Ms. Osborn allegedly asked Mr. Toader:  "Do they think you are a terrorist because of your dark skin?"  (Doc. # 36-14, *Id.* at 3.)  As with the Locher-to-Toader remark, this remark constitutes double hearsay.  And although Ms. Osborn's comment may be admissible as non-hearsay under Fed. R. Evid. 801(d)(2), Mr. Toader's remark to Plaintiff is inadmissible hearsay.  Again, however, it is possible that Mr. Toader could testify about Ms. Osborn's comment.  Given that she, like Mr. Locher, is a party to this suit, Ms. Osborn's comment would be admissible as non-hearsay under Fed. R. Evid. 801(d)(2).

Although the Court may not weigh the evidence, the Court must, in deciding whether to consider the evidence, determine at the outset whether that evidence is relevant to Plaintiff's claims.  Unlike the Locher-to-Toader comment about hiring black people, the Court finds that Ms. Osborn's comment is not relevant to Plaintiff's claims, for several reasons.  First, this comment is not "racial" in nature and thus does not have a tendency to prove the alleged hostility of Plaintiff's work environment which must be directed at Plaintiff *because* of her race.  If anything, this comment is directed toward national origin, a protected class altogether different than the at-issue class in this case; African-Americans.  Second, Ms. Osborn's comment was not directed to Plaintiff, rather it was an inquiry made to Mr. Toader,  "[d]o they think **you** are a terrorist . . . ."

Plaintiff also asserts that on or about August 6, 2007, Plaintiff complained to Mr. Locher regarding an allegedly racial comment made by Broadmoor employee Renne Freeberg.  Specifically, while discussing the criminal conviction – on dog fighting charges – of a black professional football player named Michael Vick, Mr. Freeberg told

Plaintiff that Mr. Vick "should be hanged from a tree."[5]  (Doc. # 30-1 at 4, ¶ 11; Doc.
# 36-1 at 2, ¶ 11; Doc. # 30-2 at 41:7-17; Doc # 36-14 at 5.)  Mr. Freeburg apologized to
Plaintiff the next day, and Plaintiff states in her affidavit that she was "happy with the
apology."  (Doc. # 36-14 at 6.)

A few weeks later, on August 29, 2007, Plaintiff was asked to deliver a paycheck
to Mr. Meeker.  While delivering the paycheck, Plaintiff learned that Mr. Meeker was
making $11.00 an hour as compared to her $10.30 an hour.  (Doc. # 30-1 at 4, ¶ 12;
Doc. # 36-1 at 2, ¶ 12; Doc # 36-14 at 6.)  Upon learning of the pay difference, Plaintiff
approached CPS's client, the Broadmoor, by complaining to Mr. Hoskins, the
Broadmoor's Head of Security.  (Doc. # 30-1 at 4, ¶ 13; Doc. # 36-1 at 2, ¶ 13.)

The next day, on August 30, 2007, Plaintiff approached Mr. Locher about the
alleged pay disparity.  Mr. Locher responded: "That is none of your concern" (Doc.
# 36-14 at 6.)  Mr. Locher added: "If you don't like it . . . you know what to do about it."
He then told Plaintiff that he had once been in a position where his subordinates made
more than him, while working at a hospital, and he quit.  (Doc. # 36-14 at 6.)

With respect to Plaintiff's complaint to Mr. Hoskins about her pay, apparently
Mr. Hoskins reported Plaintiff's complaint to the Broadmoor because on September 12,
2007, Kate Manzanares, the assistant HR director for the Broadmoor, told Kim Dang,
an HR representative for CPS, that Plaintiff was an employee of CPS and that it was
improper for Plaintiff to discuss CPS employment concerns with Broadmoor personnel.
(Doc. # 30-8 at 10:21-11:2; Doc. # 36-20 at 28:10-16.)

---

[5]  The exact wording of Mr. Freeburg's comment is somewhat in dispute.  Plaintiff's
version is reproduced.  In contrast, Renne Freeburg testified during his deposition that he said,
"I hope they hang him."  (Doc. # 30-5 at 15:20-22.)

**The September 12 Meeting**

On September 12, 2007, Ms. Dang traveled to Colorado Springs to meet with Plaintiff and Mr. Locher to address the Michael Vick comment.  Plaintiff did not know of the meeting and, when she arrived at work that day, found Ms. Dang and Mr. Locher waiting for her.  (Doc. # 36-14 at 8.)  In addition to the Michael Vick comment, they discussed (1) the impropriety of Plaintiff addressing employment concerns regarding CPS with the Broadmoor, and (2) Plaintiff's concerns regarding the alleged pay discrepancy.  (Doc. # 30-1 at 5, ¶ 15; Doc. # 36-1 at 3, ¶ 15; Doc. # 30-2 at 23:19-24:19.)

Defendants contend that during this meeting Ms. Dang admonished Plaintiff not to take CPS personnel complaints to the Broadmoor.  (Doc. # 30-1 at 5, ¶ 16.)  Plaintiff disputes this to some extent, claiming that Ms. Dang told her not to take her personnel complaints to Mr. Hoskins, rather than the Broadmoor.[6]  (Doc. # 36-1 at 4, ¶ 16.)  In any event, viewing the evidence in favor of the non-movant, the Court assumes Plaintiff would testify at trial that the admonishment was limited to "don't talk to Hoskins" as opposed to "don't talk to the Broadmoor."

There are other disputes regarding what topics were covered during this meeting.  Plaintiff testified that she informed Ms. Dang at this meeting that – despite whatever admonishment she received – she intended to talk to the Broadmoor about filing a complaint with the EEOC and that Ms. Dang said, "Okay, that's fine."  (Doc. # 30-2 at 22:22-23-5.)  In contrast, Ms. Dang testified in her deposition that Plaintiff did not

---

[6] The question whether Plaintiff was told not to talk to the Broadmoor versus not to talk to Mr. Hoskins is relevant with respect to the issue of whether Plaintiff was insubordinate.

mention filing a complaint with the EEOC during this meeting.  (Doc. 37-6 at 60:21-61:3.)  Plaintiff also testified that, a couple days after the September 12 meeting, she did in fact speak with Ms. Manzanares about filing a charge of discrimination against CPS.  (Doc. # 30-2 at 68:25-69:6.)  Ms. Manzanares could not recall this conversation during her deposition.  (Doc. 30-8 at 24:8-12.)

It is not disputed that Plaintiff understood that she was employed by CPS, not the Broadmoor, and that the Broadmoor was a client of CPS.  (Doc. # 30-2 at 20:19-21:8.) Moreover, if she did not already know, Plaintiff learned in the September 12 meeting that she was to direct all personnel matters to CPS, not the Broadmoor.  (Doc. # 30-2 at 23:9-14; Doc. # 30-1 at 5, ¶ 17; Doc. # 36-1 at 4, ¶ 17.)

Eight days after this meeting, on September 20, 2007, Ms. Ann Alba, Resident Manager at the Broadmoor, wrote a letter to Mike Mills, President and CEO of RPM Parking Companies,[7] complaining about the manner with which Mr. Locher handled two incidents: (1) the aftermath from the Michael Vick comment and (2) the circumstances surrounding Mr. Foster's termination.  (Doc. # 36-16 at 7.)  Four days later, Mr. Mills informed Ms. Alba that he had removed Mr. Locher from his Garage Manager position. (Doc. # 36-16 at 9.)

### The Suspension, Investigation, and Firing

On or about October 1, 2007, Ms. Dang learned that Plaintiff had told a co-worker, Luz Palacios, that "people know better than to f--k with me" and that she was

---

[7]   Whatever the relationship between RPM and CPS, it is clear that Mr. Mills had authority to punish Mr. Locher, a CPS employee, as he did here.

going to "beat Pam [Osborne] up."[8]  Plaintiff denies these comments.  (Doc. # 30-1 at 6,
¶ 19; Doc. # 36-1 at 5-6, ¶ 19; Doc. # 30-9 at 14:5, 18:13, 26:8-16; Doc. # 30-10, ¶¶ 10,
12; Doc. # 30-11, ¶ 6; Doc. # 36-14 at 9; Doc # 36-17 at 6.)

On October 3, 2007, Ms. Osborn learned from Ms. Alba that Plaintiff had again
complained to Broadmoor employees about her employment situation at CPS.  (Doc.
# 30-1 at 5, ¶ 18; Doc. # 36-1 at 4-5, ¶ 18; Doc. # 30-10, ¶ 13; Doc. # 30-11, ¶ 8.)

On October 4, 2007, CPS, via Ms. Dang, suspended Plaintiff pending an
investigation.  (Doc. # 30-1 at 6, ¶ 20; Doc. # 36-1 at 6, ¶ 20; Doc. # 30-11, ¶ 7.)
CPS cited the following reasons for suspending Plaintiff: comments threatening
comments a manager and an employee, using foul language, and for being
insubordinate by continuing to complain to the Broadmoor about her employment
situation at CPS.  (Doc. # 30-11, ¶ 7; Doc. #  30-7 at 14, 16.)

During the post-suspension investigation, Ms. Dang learned about another
incident involving Plaintiff and Ms. Palacios.  (Doc. # 30-10, ¶ 14; Doc. # 30-9 at 12:9-
11.)  Ms. Palacios testified that, after she encountered Plaintiff in Wal-mart, Plaintiff told
her that she was "going to kick her [Ms. Palacios's] butt" for telling Ms. Osborn about
Plaintiff's "people know better than to f--k with me" comment.  (Doc. # 30-9 at 10:18-
12:25; Doc. # 36-17 at 5; Doc. # 30-1 at 6, ¶ 22; Doc. # 36-1 at 6-7, ¶ 22.)  Ms. Palacios
reported the Wal-Mart incident to Ms. Osborn who then reported it to Ms. Dang.  (Doc.
# 30-10, ¶ 14.)

---

[8]  This evidence is admissible as non-hearsay under Fed.R.Evid. 801(d)(2) and
Ms. Palacios could testify about it at trial under Fed.R.Evid. 602.

Ms. Dang also investigated the alleged pay discrepancy and learned that Plaintiff received the same or greater wage than Mr. Meeker until April 23, 2007, when he received a raise.  (Doc. # 30-7 at 93:11-15.)  Ms. Dang also learned that Plaintiff was paid more than Mr. Ortiz who, like Plaintiff, was a part-time supervisor.  (Doc. # 30-1 at 7, ¶ 25; Doc. # 36-1 at 7, ¶ 25; Doc. # 30-10, ¶ 17.)  Ms. Dang further learned that Plaintiff and Mr. Foster, who had held the exact same position as Plaintiff prior to Mr. Ortiz, had been paid the same amount.  (Doc. # 30-10, ¶¶ 5-8, 17; Doc. # 30-1 at 7, ¶ 26; Doc. # 36-1 at 8, ¶ 26.)  In any event, CPS gave both Plaintiff and Mr. Ortiz a three percent retroactive pay increase, although Plaintiff contends "it was not the 2 years back pay as it should have been."  (Doc. # 30-10, ¶ 17; Doc. # 30-1 at 7, ¶ 27; Doc. # 36-1 at 8, ¶ 27; Doc. # 36-14 at 10.)

Ultimately, CPS concluded that Plaintiff's behavior violated Location Rules 24 and 32, which prohibit abusive language and threats, Item 2 of the Employee Handbook, and express directives of Plaintiff's supervisors.  (Doc. # 30-1 at 6, ¶ 23; Doc. # 36-1 at 7, ¶ 23; Doc # 30-4 at 9.)  As a result, on October 10, 2007, Plaintiff was fired.  (Doc. # 30-1 at 6, ¶ 24; Doc. # 36-1 at 7, ¶ 24.)

Plaintiff filed a Charge of Discrimination with the EEOC on December 4, 2007. (Doc. # 33-3 at 5.)  After receiving a right-to-sue letter, on January 5, 2009, Plaintiff filed her First Amended Complaint.  (Doc. # 13-2.)  Defendants moved for summary judgment on all claims.  The motion is fully briefed and ripe for review.

## II.  ANALYSIS

### A.   STANDARD OF REVIEW

Summary judgment is warranted under Federal Rule of Civil Procedure 56(c) when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  A disputed fact is "material" if under the relevant substantive law it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001).  Only disputes over material facts can create a genuine issue for trial and preclude summary judgment.  *Faustin v. City & County of Denver*, 423 F.3d 1192, 1198 (10th Cir. 2005).  An issue is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  When reviewing a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party.  *Id.*

### B.   FEDERAL LAW CLAIMS

#### 1.     Hostile Work Environment

In her first claim for relief, Plaintiff alleges that Defendant CPS and Defendants Locher and Osborn violated 42 U.S.C. § 2000e, *et seq.* (Title VII), and 42 U.S.C. § 1981, respectively, by creating a hostile work environment.  Title VII forbids employment discrimination on the basis of race; this prohibition covers an employee's claims of a hostile work environment based on race.  *Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675, 680 (10th Cir. 2007).  "Section 1981 "protects employees from racial discrimination both in entering into an employment contract and in enjoying the benefits,

privileges, terms and conditions of employment." *Exum v. U.S. Olympic Committee*, 389 F.3d 1130, 1134 (10th Cir. 2004) (internal citations omitted).  "The elements of a hostile work environment claim under § 1981 are the same as those under Title VII." *Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1170 (10th Cir. 2008) (quotations and alterations omitted).

"To survive summary judgment, a plaintiff must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Sandoval v. City of Boulder*, Colo., 388 F.3d 1312, 1326-27 (10th Cir. 2004).  In addition, Plaintiff must produce evidence from which a rational jury could infer that she was targeted for harassment **because** of her race. *Id.*

> In this undertaking, [the Court] consider[s] all the circumstances not from the plaintiff's subjective point of view but from the perspective of a reasonable person in the plaintiff's position.  Still, the victim must also 'subjectively perceive the environment to be abusive' because without such a belief, 'the conduct has not actually altered the conditions of the victim's employment.'

*Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1170 (10th Cir. 2007) (citations omitted).

With respect to CPS's liability for the alleged actions of Ms. Osborn and Mr. Locher, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Gunnell v. Utah Valley State College*, 152 F.3d 1253, 1261 (10th Cir. 1998.)  Thus, before CPS can be held liable, there first must be an "actionable" hostile work environment created by Mr. Locher and/or Ms. Osborn.

Plaintiff asserts that the comments and actions of Mr. Locher and Ms. Osborn were both severe and pervasive.  In support, she argues that they occurred over a significant period of time and were humiliating.  In addition to the allegedly racial remarks, Plaintiff cites to the Penrose incident and claims Defendants' acts prohibiting her from checking her voice-mail and using the computers "like the White supervisors . . . reinforced the humiliation on a daily basis."  (Doc. # 36-2 at 7.)  She concludes that Ms. Osborn is a "serial harasser" and that Mr. Locher knew about Ms. Osborn's conduct yet "repeatedly failed to stop her."

"The question on summary judgment . . . is whether a jury, in view of all of the evidence, could reasonably conclude the discriminatory harassment to be sufficiently severe or pervasive as "to alter the conditions of [the victim's] employment and create an abusive working environment[.]" *Id.*  In light of that standard, the Court concludes the evidence is insufficient to allow a reasonable jury to conclude that Plaintiff suffered a hostile work environment.

First, Ms. Osborn's comments.  Ms. Osborn remarked that Plaintiff looked young because she had surgery; repeatedly inquired as to Plaintiff's income and asked Plaintiff how she could afford such a nice car; and once told Plaintiff that black people are "just not qualified" for jobs at CPS.  Ms. Osborn also was partly responsible for giving "all the white workers a certificate to eat in the Penrose Room" while excluding Plaintiff and told Plaintiff that she didn't need the voice mail codes because Plaintiff worked the night shift.  The questions about her income made Plaintiff feel as if Ms. Osborn was suggesting Plaintiff "did something illegal because she was Black."  (Doc. # 36-14 at 3.) And the codes' incident left Plaintiff feeling that she "wasn't being trusted."

-17-

With respect to Mr. Locher, he once told Mr. Toader that "[w]e do not hire black people because they are too hard to get rid of."  There is evidence suggesting he wasn't a very supportive or attentive supervisor.  He laughed when Plaintiff told him about Ms. Osborn's "black women look so young because of surgery" remark.  And Plaintiff claims he did nothing whenever she complained.  For instance, when Plaintiff approached Mr. Locher about the alleged pay disparity, he replied: "That is none of your concern" before suggesting she should quit, as he once did in a similar situation.  When she complained to Mr. Locher about the Michael Vick comment, again he did nothing.

Mr. Freeburg, an employee of the Broadmoor, told Plaintiff that Mr. Vick "should be hanged from a tree."  Plaintiff felt the remark had a racial connotation and was aimed at her.  She elaborates in her affidavit, explaining that "since in civil war times, Black Slaves who did not obey their owners were hanged by the KKK vigilantes in the South; and he was talking to me as a Black Person."  This bit of history notwithstanding, Plaintiff's interpretation of this remark is indicative of an underlying current in this case: Plaintiff is a sensitive person who offends easily.  Thus, as mentioned, she satisfies the legal requirement that she subjectively perceive the environment to be abusive.  *See Montes*, 497 F.3d at 1170.

In the course of over two years at CPS – September 2005 to October 2007 – Plaintiff has suffered a handful of remarks that she perceived as offensive.

A useful comparison is the *Herrera* case.  In *Herrera*, the plaintiff's manager – who refused to shake the plaintiff's hand upon meeting – regularly referred to the plaintiff, Mr. Herrera, as "the fucking Mexican".  *Id.* at 680-81.  Mr. Herrera was admonished not to "Mexicanize" the company truck.  *Id.* at 681.  Further, a witness

testified that he "never saw [another co-worker] talk to a Caucasian like he did with Mr. Herrera." *Id.* at 683 n.8.  And another witness testified that the same co-worker would use the terms "wetback" and "spics" when discussing Mexicans.  *Id.* at n.10.

Plaintiff has not suffered anywhere near the sort of "steady barrage of opprobrious racial comments" courts have considered actionable.  *See Herrera*, 474 F.3d at 680; S*ee also, e.g., Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (summary judgment in favor of the defendants affirmed where a defendant's two racial comments *fell far short* of the steady barrage required for a hostile environment claim).  For these reasons, the Court grants summary judgment in favor of Defendants' on Plaintiff's hostile work environment claim.

## 2.    Discrmination

In her second claim for relief, Plaintiff alleges that CPS treated her differently than similarly situated white employees because of her race, in violation of Title VII and Section 1981.  *See Tademy*, 520 F.3d at 1156; *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 n. 3 (10th Cir. 1993).  In particular, she alleges that she was paid as a cashier, even though she was a supervisor, so that she would receive less than subordinate white employees, such as Mr. Meeker.[9]  Plaintiff claims she can prove her claim of disparate treatment by either direct or indirect evidence.

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption."  *Hall v. United States Department of Labor, Administrative Review Board*, 476 F.3d 847, 854 (10th Cir. 2007)(citation omitted).

---

[9] Although Plaintiff's Amended Complaint does not raise the issue of whether she was fired because of her race – instead describing her firing in the context of her retaliation claim – the Court nonetheless addresses it as part of her disparate treatment claim.

Plaintiff's "direct evidence":  when she allegedly complained to Mr. Locher about

the pay discrepancy, he said nothing.  This is not direct evidence of discrimination.

"A statement that can plausibly be interpreted two different ways-one discriminatory and

the other benign-does not directly reflect illegal animus, and, thus, does not constitute

direct evidence."  *Id.* at 855.  Mr. Locher's silence could mean any number of things,

all of which require an inference to determine.  Thus, this does not constitute direct of

evidence of discrimination.

Where there is no direct evidence of discrimination, both Title VII and Section

1981 claims are analyzed under the familiar *McDonnell Douglas* burden-shifting

framework.  *Randle v. City of Aurora*, 69 F.3d 441, 450-51 (10th Cir. 1995).  Thus,

regardless of the specific statutory source of the claim, the question is whether Plaintiff

has met her McDonnell Douglas burden at the summary judgment stage.

The *McDonnell Douglas* analysis proceeds in three distinct steps:

> McDonnell Douglas first requires the aggrieved employee to establish
> a prima facie case of prohibited employment action. The burden of
> establishing a prima facie case by a preponderance of the evidence is not
> onerous.  Furthermore, this burden is one of production, not persuasion;
> it can involve no credibility assessment.  If the employee makes a prima
> facie showing, the burden shifts to the defendant employer to state a
> legitimate, nondiscriminatory reason for its adverse employment action.
> If the employer meets this burden, then summary judgment is warranted
> unless the employee can show there is a genuine issue of material fact
> as to whether the proffered reasons are pretextual.

*Plotke*, 405 F.3d at 1099 (10th Cir. 2005) (citations, quotations, alterations omitted).

Plaintiff's first task is to make out a prima facie case of rase-based disparate

treatment.  "[T]he elements required for . . . a [prima facie] showing are somewhat

flexible depending on the facts of the case." *Sandoval*, 388 F.3d at 1325.[10]  Plaintiff appears to base her claim of disparate treatment on two separate but related sets of facts:  (a) that she was paid less because she was black, and (b) that she was fired because she was black.

      a.    <u>Disparate Treatment – Pay</u>

Plaintiff can satisfy her prima facie burden if she can show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) she was treated less favorably than similarly situated employees not in the protected class.  *See, e.g., Trujillo v. Univ. of Colo. Health Sci. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998) (Title VII claim); *Sydney v. ConMed Elec. Surgery*, 275 F. App'x 748, 751-52 (10th Cir. 2008) (same elements for § 1981 claim).  The last element may be met by showing "that the employer treated similarly situated employees more favorably."  *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 (10th Cir. 2005).

Plaintiff fails to make out a prima facie case of wage discrimination because there is no genuine issue regarding whether she was paid less than similarly situated non-black employees.  Mr. Foster was a similarly situated non-black employee.  He and Plaintiff were both hired as cashiers in September 2005.  They both began at $9.50 an hour.  Both were eventually promoted to part-time supervisor.  And both eventually received raises to $10.00 an hour.  Neither side disputes any of this.

---

[10]  "The Supreme Court recognized in McDonnell Douglas that the articulation of a plaintiff's prima facie case may well vary, depending on the context of the claim and the nature of the adverse employment action alleged."  *Plotke v. White*, 405 F.3d 1092, 1099 (10t Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 n. 13.).

Mr. Ortiz, who was Mr. Foster's replacement, was another similarly situated non-black employee. Mr. Ortiz was hired in May 2007 at a rate of $10.30 an hour, the same rate Plaintiff was earning at the time. Both were part-time supervisor earning $11.00 an hour. Moreover, as the undisputed evidence shows, in the form of Ms. Dang's declaration, Mr. Ortiz and Plaintiff *both* received three percent retroactive pay raises.[11] Ms. Dang, a Human Resources representative for CPS, would have personal knowledge of such a pay raise. Plaintiff, on the other hand, would have knowledge only of her own pay raise. *See also Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1314-15 (10th Cir. 2006) (statements by human resources employee – whose job included reviewing personnel records – regarding disparities in pay between men and women was admissible because based on personal knowledge).

In an attempt to prove she was treated less favorably, Plaintiff contends that Mr. Meeker, a maintenance worker whom Plaintiff supervised, appears to have been earning more than her. But any discrepancy in pay between Plaintiff and Mr. Meeker is irrelevant to Plaintiff's claim of disparate treatment. Plaintiff must prove that *similarly-situated* employees were earning more than her. "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *McGowan v. City of Eufala*, 472 F.3d 736, 745 (10th Cir. 2006) (citation omitted). Plaintiff has not established that she was similarly situated to Mr. Meeker in all relevant respects. *Id.* (citations omitted).

---

[11]  The raises were apparently given to offset, at least partially, the pay differential between Mr. Ortiz and Plaintiff, on the one hand, and Mr. Meeker on the other. Whatever the reason, it is immaterial given that Mr. Ortiz and Plaintiff – "similarly situated" part-time supervisors – both received raises.

Mr. Meeker was a maintenance employee.  Plaintiff was not; she was a part-time

parking supervisor.  The two positions are *not* similarly-situated.

The only other employees similarly situated to Plaintiff were Mr. Foster and

Mr. Ortiz.  They both worked the same job as Plaintiff and earned the same wage as

Plaintiff.  Plaintiff argues, however, that both Mr. Foster and Mr. Ortiz were paid more

than her because they were allowed to receive tips while she was not.   But Plaintiff fails

to support this claim with specific facts that would be admissible at trial.  *See Adler v.*

*Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) ("If the movant carries this

initial burden . . . the burden shifts to the nonmovant to go beyond the pleadings and

'set forth specific facts' that would be admissible in evidence in the event of trial . . .").

The statement in Plaintiff's affidavit purporting to know that Mr. Foster and

Mr. Ortiz were allowed to receive tips while others were not is not sufficient because

it is not based on her personal knowledge.[12]  That is, Plaintiff's claim that these other

employees were *allowed* to receive tips, as opposed to the fact they received tips –

which she could know, had she observed it – is not supported by anything other than

her speculative statement saying so.  *See Argo*, 452 F.3d at 1200 ("Under the personal

knowledge standard, an affidavit is inadmissible if the witness could not have actually

perceived or observed that which he testifies to.") (internal quotation marks omitted);

*See also Mickelson*, 460 F.3d at 1314-15 (statements by human resources employee –

whose job included reviewing personnel records – regarding disparities in pay between

men and women was admissible because based on personal knowledge).  Plaintiff does

_____

[12] Or, if she does *know* about the tips treatment, Plaintiff fails to provide foundation as to
how she knows.

not point to a written company policy prohibiting some but not all employees from receiving tips, nor a witness statement, such as one from a human resources representative who would *know* of the differing pay schemes.  Because Plaintiff's claim that others were allowed tips while she was not is not supported by admissible evidence, the Court disregards it.

The evidence suggests that Mr. Meeker was earning more than all the part-time supervisors, not just Plaintiff.  This in turn suggests that maintenance workers, generally, or Mr. Meeker, in particular, are more highly valued at CPS than part-time supervisors.  It does not suggest that Plaintiff was discriminated against because of her race.  Plaintiff's claim of disparate treatment regarding the alleged pay differential fails at the *prima facie* level.

      b.      <u>Disparate Treatment – Firing</u>

With respect to her claim that she was fired because of her race, Plaintiff can satisfy her prima facie burden by showing that (1) she was a member of a protected class; (2) she was qualified and satisfactorily performing his job; and (3) she was terminated under circumstances giving rise to an inference of discrimination.  *Salguero v. City Of Clovis*, 366 F.3d 1168, 1175 (10th Cir. 2004).  As to the third prong, one method by which Plaintiff can show circumstances giving rise to an inference of discrimination is to show that the employer treated similarly situated employees more favorably.  *See PVNF, L.L.C.,* 487 F.3d 790.  As mentioned, "[i]ndividuals are considered 'similarly-situated' when they deal with the same supervisor, are subjected to the same standards governing performance evaluation and discipline, and have engaged in conduct of "comparable seriousness."  *Id*.

Plaintiff's claim fails at the prima facie stage because she was not terminated under circumstances giving rise to an inference of discrimination.  She has not identified any evidence showing that other employees who threatened their supervisor or used foul language – or, rather, other employees of whom CPS had a good-faith belief had threatened their supervisor or used foul language – were somehow treated differently than Plaintiff, *i.e.*, not fired.

Plaintiff instead highlights the examples of Mr. Foster and Mr. Locher, both of whom were reprimanded by CPS for various transgressions.  Because Mr. Locher had a different position with a different supervisor, he was not similarly situated with Plaintiff.  Mr. Foster, on the other hand, had the same position as Plaintiff.  And like Plaintiff, he was fired.  Plaintiff claims that Mr. Foster used drugs at work and that he was fired for "sexual harassment."  Assuming he did either or both, these transgressions would have violated the CPS policy against harassment and Location Rule # 1, which prohibits using controlled substances on the job.  (*See* Doc. # 37-6 at 13; Doc. # 30-7, ¶1.)

Plaintiff was fired for violating the Location Rules 24 and 32, which prohibit using profane language toward another employee and threatening anyone on company property.  (Doc. # 30-7, ¶¶ 24, 32.)  Both Mr. Foster and Plaintiff suffered the same fate.  Thus, she cannot claim that somehow he was treated less severely.  Indeed, these facts do not suggest that CPS treats similarly situated employees differently.  Rather, it suggests the opposite, that CPS treats part-time supervisors who commit acts of comparable seriousness, *i.e.*, violating the Local Rules or CPS policy, in the same way: it fires them.

In sum, because Plaintiff has not stated a prima facie case of disparate treatment with respect to her firing, the Court will enter summary judgment in favor of Defendants.

**3.     Retaliation**

Plaintiff's third claim arises under 42 U.S.C. § 2000e-3, which "prohibits an employer from discriminating against an employee in retaliation for opposing unlawful employment practices." *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1263 (10th Cir. 1998). "Where there is no direct evidence of retaliation, [the Court] analyze[s] a retaliation claim under the McDonnell Douglas burden-shifting framework." *Stover v. Martinez*, 382 F.3d 1064, 1070 (10th Cir. 2004) (citations omitted). Thus, Plaintiff must first demonstrate a prima facie case.

A prima facie case of retaliation requires a plaintiff to show: "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1212 (10th Cir. 2008) (quoting *Argo*, 452 F.3d at 1202).

Plaintiff must first show she engaged in protected opposition. "Opposition to an employer's conduct is protected by § 2000e-3(a) only if it is opposition to a "practice made an unlawful employment practice by [Title VII]. Title VII does not prohibit all distasteful practices by employers." *Petersen v. Utah Dept. of Corrections*, 301 F.3d 1182, 1188 (10th Cir. 2002). "Informal complaints to superiors constitute protected activity." *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001). "But a vague reference to discrimination and harassment without any indication that this

misconduct was motivated by race (or another category protected by Title VII) does not constitute protected activity and will not support a retaliation claim." *Anderson v. Academy School Dist. 20*, 122 Fed.Appx. 912, 916 (10th Cir. 2004) (citing *Petersen*, 301 F.3d at 1188).

During her deposition Plaintiff testified that she was fired for her role in Mr. Locher being barred from the Broadmoor. She did not testify that that she was fired in retaliation for any complaints regarding the perceived wage discrimination and/or hostile work environment. (*See* Doc. # 30-2 at 63:7-16)  Mr. Locher was barred from the Broadmoor because of his handling of the Michael Vick comment and the circumstances surrounding the firing of Mr. Foster.  In her Response brief, Plaintiff attempts to remedy her deposition testimony on this issue by adding that she engaged in protected activity when she told Mr. Locher, Mr. Hoskins, and Ms. Dang about the Michael Vick comment, and when she told Ms. Dang – allegedly sometime in September 2007 – that she was going to file an EEOC complaint.

There is a dispute as to whether Plaintiff did or did not tell Ms. Dang that she was going to file an EEOC complaint.  Plaintiff says "yes"; Ms. Dang says "no".  Either way, it does not matter.  The parties agree that Plaintiff and Ms. Dang did discuss Plaintiff's concerns regarding the wage differential.  If those concerns were based on a belief that she was being paid less because of her race, then that would that would constitute "protected opposition" to an act made unlawful by Title VII, specifically, wage discrimination because of race.  *See* 42 U.S.C. § 2000e, *et seq*.

Although it is true that "[i]nformal complaints to superiors constitute protected activity," Mr. Hoskin was not Plaintiff's superior.  In fact, Mr. Hoskins worked for CPS'

client.  The Court knows of no case law that holds that complaining to your company's client is "protected opposition." Nonetheless, the Court will assume, for purposes of this analysis, that Plaintiff engaged in protected opposition when she complained to her employer's client.

The question turns, then, to the issue of causation.  It is undisputed that Plaintiff suffered a materially adverse employment action–she *was* fired.  Because of the close temporal proximity between the September 12 meeting, during which the wage concern was raised, and October 10, the day Plaintiff was fired, the Court finds that Plaintiff satisfies her prima facie burden of demonstrating a causal connection between the complaint and her termination.  *See Argo*, 452 F.3d at 1202 (finding that 24 days between an employee's complaint and their termination sufficient to allow an inference that a causal connection existed between the complaint and the termination); *See also Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (indicating that a period of six weeks gives rise to a rebuttable inference of a causal connection, but that a period of three months does not).

The burden now shifts to CPS to articulate a legitimate, nondiscriminatory reason for firing Plaintiff.  As mentioned, CPS has submitted evidence showing that Plaintiff was fired because she violated both CPS's Location Rules and policy.  Plaintiff was an employee of CPS, not the Broadmoor, a fact she well understood.  Upon learning that Plaintiff had spoken to Broadmoor employees regarding grievances she had with CPS, Plaintiff's supervisors instructed Plaintiff that if she had personnel issues they were to be taken to CPS, not the CPS' client, the Broadmoor.  Nonetheless, there is evidence showing that Plaintiff again took her complaints about CPS to the Broadmoor.  Although

Plaintiff attempts to dispute this, there is no evidence to contradict the fact that

Ms. Alba, the Resident Manager at the Broadmoor, so informed CPS.  In addition,

CPS learned from Ms. Palacios that Plaintiff had threatened Ms. Osborn and

Ms. Palacios, in violation of CPS's company policies.[13]

Plaintiff's violations of CPS's Location Rules and company policies were

legitimate, non-discriminatory reasons for CPS to fire Plaintiff.  Plaintiff herself admits

that, assuming the above-actions occurred, they would constitute legitimate reasons

for firing her:

> Q.    You would agree, would you not, that wearing your supervisory hat,
> that if you learned that one of the cashiers had said that they were
> going to beat up a supervisor, that would be cause for termination?
>
> A.    If it was said, yes.
>
> Q.    And you would agree, would you not, that if one of your subordi-
> nates had made a statement like, The company knows better
> than to f--k with me, that that would be cause for termination?
>
> A.    If it was said, yes.

(Doc. # 30-2 at 69:13-22.)

CPS having articulated several legitimate non-discriminatory reasons for firing

Plaintiff, the burden now shifts to her to demonstrate pretext.  Summary judgment in

favor of CPS is warranted only if Plaintiff has "failed to produce any evidence from

which a reasonable inference could be drawn" that the CPS's proffered reasons were

pretextual.  *Salguero*, 366 F.3d at 1176.

Generally, "[a] plaintiff demonstrates pretext by producing evidence of
such weaknesses, implausibilities, inconsistencies, incoherencies, or

---

[13]  Again, although Plaintiff disputes this ever happened, she cannot dispute that CPS *thought* it had happened.

> contradictions in the employer's proffered legitimate reasons for its
> action that a reasonable factfinder could rationally find them unworthy of
> credence and hence infer that the employer did not act for the asserted
> non-discriminatory reasons."

*Sanders v. Southwestern Bell Telephone, L.P.*, 544 F.3d 1101, 1106 (10th Cir.

2008)(citation omitted).

Plaintiff cannot satisfy her burden.  Although she makes numerous assertions

about the conduct of others in her affidavit – in determining whether CPS's proffered

reasons for its decision were pretextual – the Court considers "the facts as they appear

to the person making the decision to terminate [Plaintiff]."  *Id.*, quoting *Kendrick*, 220

F.3d at 1231; *See also Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir.

1999) (noting that the manager's perception of employee's performance, rather than

the employee's own evaluation of his or her performance, is relevant in determining

pretext).  Because CPS honestly believed that Plaintiff had violated its policies by airing

personnel issues to its client and threatening her co-workers, aside from the question of

whether she actually did those things, CPS's proffered reasons are not "inconsistent,

implausible, incoherent, or contradictory."  Summary judgment will be entered in favor of

CPS on Plaintiff's retaliation claim.

## C.    STATE LAW CLAIMS

In addition to her federal claims, Plaintiff asserts two state law claims.  "In cases

involving state-law claims, a federal court applies the substantive law of the state, but

applies federal procedural law."  *Herrera*, 474 F.3d at 683.  Thus, Colorado's

substantive law governs.

1.      **Intentional Infliction of Emotional Distress ("IIED")**[14]

In her fourth claim for relief, Plaintiff alleges that Defendants are liable to her for

intentional infliction of emotional distress.  For Plaintiff's claim to succeed, Defendants'

actions must have been:

> so outrageous in character, and so extreme in degree, as to go beyond all
> possible bounds of decency, and to be regarded as atrocious, and utterly
> intolerable in a civilized community.  Generally, the case is one in which
> the recitation of the facts to an average member of the community would
> arouse his resentment against the actor, and lead him to exclaim,
> "Outrageous!"

*Churchey v. Adolph Coors Co.*, 759 P.2d 1336, 1350 (Colo. 1988) (citing *Rugg v.*

*McCarty*, 173 Colo. 170, 476 P.2d 753, 756 (1970)).  Although "the question of whether

conduct is outrageous is generally one of fact to be determined by a jury, it is first the

responsibility of a court to determine whether reasonable persons could differ on the

question."  *Culpepper v. Pearl Street Bldg., Inc.*, 877 P.2d 877, 883 (Colo. 1994); *see*

*also Bauer v. Southwest Denver Mental Health Center, Inc.*, 701 P.2d 114, 118 (Colo.

App. 1985) ("The trial court must determine, as a threshold matter of law, whether the

defendant's alleged conduct was sufficiently heinous to create a submissible claim.

If, after viewing the evidence in the light most favorable to plaintiff, the court determines

that no reasonable person could conclude that the defendant's conduct was outrageous,

summary judgment is appropriate.").

Plaintiff's IIED claim is based on the same acts that constitute her Title VII and

section 1981 claims.  (*See* Doc. # 13-2, ¶¶ 27, 28.)  Despite viewing the record in light

---

[14]   The terms "intentional infliction of emotional distress" and "outrage" are different labels referring to the same tort.  *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 81 F.Supp.2d 1090, 1096 (D. Colo. 2000).

most favorable to Plaintiff, as it must, the Court finds that no reasonable juror could conclude that Defendants' conduct was outrageous.  Thus, summary judgment is appropriate.

> **2.    Willful and Wanton Breach of Express or Implied Contract, Unjust Enrichment**

In her fifth claim for relief, Plaintiff alleges several contract-related claims regarding the alleged wage discrimination: (1) that CPS failed to pay Plaintiff as a supervisor per their express agreement; (2) in the absence of an express agreement, that CPS violated an implied agreement in that Plaintiff had the expectation she would be paid as a supervisor but was instead paid as a cashier; and (3) that CPS was unjustly enriched in that Plaintiff conferred a benefit on CPS – working as a supervisor while getting paid as a cashier – which CPS realized and accepted under such circumstances that it would be inequitable for the CPS to retain the benefit without full payment of its value.  (Doc. # 13-2, ¶¶ 30, 31.)

The elements of breach of contract are: (1) the existence of contract; (2) performance by the plaintiff; (3) failure to perform by the defendant; and (4) damages.  *Conagra Trade Group, Inc. v. Fuel Exploration, L.L.C.*, 636 F.Supp.2d 1166, 1171 (D. Colo. 2009) (citing *Western Distributing Company v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

As to Plaintiff's claim regarding the parties' express "agreement", there is no evidence to support the existence of any contractual obligation that was not performed by CPS.  The evidence shows that Plaintiff was paid the exact same salary as Mr. Foster, the other supervisor who, like Plaintiff, was hired as a cashier and then promoted to supervisor.  Although Plaintiff claims that Mr. Foster was allowed to receive

tips while she was not, Plaintiff offers no admissible evidence in support of that allegation.  Her affidavit is insufficient in this respect, as there is no foundation to show that such information would be within her personal knowledge.  *See Argo*, 452 F.3d at 1200 ("Under the personal knowledge standard, an affidavit is inadmissible if the witness could not have actually perceived or observed that which he testifies to. Accordingly, at the summary judgment stage, statements of mere belief in an affidavit must be disregarded.") (internal citations and quotation marks omitted).  Even if Plaintiff knew that Mr. Foster received tips, *e.g.*, by seeing it happen, she offers nothing to support the notion that CPS permitted him to receive those tips while prohibiting her from doing the same.

Plaintiff also asserts that she was paid less than Mr. Ortiz, the employee hired to replace Mr. Foster.  But, again, Plaintiff fails to cite to evidence in the record supporting this "fact."  Because Plaintiff fails to proffer admissible evidence showing the presence of a genuine issue, Plaintiff's contract claim must fail.

In the alternative to her contract claim, Plaintiff asserts that CPS is liable for unjust enrichment.  To succeed on this claim, Plaintiff must prove that (1) CPS received a benefit, (2) at her expense, (3) under circumstances that would make it unjust for CPS to retain the benefit without paying.  *Robinson v. Colorado State Lottery Division*, 179 P.3d 998, 1007 (Colo. 2008); *See also Braddock Financial Corp. v. Washington Mut. Bank*, 637 F.Supp.2d 924, 933 (D. Colo. 2009) (applying Colorado law).

The "benefit" CPS allegedly received is Plaintiff's work as a supervisor while Plaintiff was being paid as a cashier.  (*See* Doc. # 13-2, ¶ 31.)  Given the absence of evidence indicating any difference in pay between Plaintiff and other supervisors,

the Court must enter summary judgment in CPS' favor on Plaintiff's unjust enrichment claim.[15]

## III.  CONCLUSION

Based on the foregoing, the Court ORDERS that Defendants' Motion for Summary Judgment (Doc. # 30) is GRANTED.  Accordingly, this case is DISMISSED WITH PREJUDICE.  It is

FURTHER ORDERED that the Final Trial Preparation Conference, scheduled for December 18, 2009, and the five-day jury trial, scheduled for January 11, 2010, are VACATED.  It is

FURTHER ORDERED that Defendants shall have their costs by the filing of a Bill of Costs with the Clerk of the Court within ten days of the entry of judgment.

DATED:  December __11__, 2009

BY THE COURT:

_Christine M Arguello_

_____
CHRISTINE M. ARGUELLO
United States District Judge

---

[15] Plaintiff alleges for the first time in her Response to Defendants' motion for summary judgment that CPS breached an "agreement" by failing to provide her with unused vacation pay. Because this charge was not raised in her complaint nor her amended complaint nor anywhere else in the intervening eleven months between the filing of the first complaint and the filing of this Response, the Court will not consider it.  *See, e.g., Green Country Food Mkt. v. Bottling Group, LLC*, 371 F.3d 1275, 1279 (10th Cir. 2004) ("The liberalized pleading rules . . . do not permit plaintiffs to wait until the last minute to ascertain and refine the theories on which they intend to build their case.").